1
2
3
4
5
6
7
8                         IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DALE D. THOMPSON,

11                  Petitioner,                No. CIV S-05-1158 GEB GGH P

12        vs.

13   TOM CAREY, et al.,

14                  Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  In 1980 petitioner was convicted of first degree murder

19   and sentenced to 7 years to life.  Petitioner challenges the 2002 decision by the California Board

20   of Prison Terms (BPT) finding him unsuitable for parole.  This was petitioner's eighth suitability

21   hearing.  Petition, p. 5.  After carefully reviewing the record, the court recommends that the

22   petition be denied.

23   II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

24              The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

25   petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

26   138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

1   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

2   standards of review to be used by a federal habeas court in assessing a state court's adjudication

3   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

4   (9th Cir. 1997).

5          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

6   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

7   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

8   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

9   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

10  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

11  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

12  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

13         "Unreasonable application" of established law, on the other hand, applies to

14  mixed questions of law and fact, that is, the application of law to fact where there are no factually

15  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

17  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

18  deference is not blindly automatic, "the most important point is that an *unreasonable* application

19  of federal law is different from an incorrect application of law....[A] federal habeas court may not

20  issue the writ simply because that court concludes in its independent judgment that the relevant

21  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

22  that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

23  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

24  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

25  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

26  /////

1        The state courts need not have cited to federal authority, or even have indicated

2   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

3   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

4   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

5   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

6   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

7   established Supreme Court authority reviewed must be a pronouncement on constitutional

8   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

10        However, where the state courts have not addressed the constitutional issue in

11  dispute in any reasoned opinion, the federal court will independently review the record in

12  adjudication of that issue.  "Independent review of the record is not de novo review of the

13  constitutional issue, but rather, the only method by which we can determine whether a silent state

14  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15  2003).

16        Petitioner filed a habeas corpus petition in the Solano County Superior Court

17  raising the claims raised in the instant petition.  Respondent's Answer, Exhibit 5.  The Superior

18  Court issued a reasoned decision denying the petition.  Id.  Petitioner filed habeas petitions in the

19  California Court of Appeal and California Supreme Court which were summarily denied.

20  Petition, Exhibits E and F.  When reviewing a state court's summary denial of a claim, the court

21  "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard,

22  234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

23  III.  Background

24        The factual background of petitioner's offense is relevant to the analysis of

25  petitioner's claims.  A factual summary is contained in the opinion of the California Court of

26  Appeal affirming petitioner's conviction.  Because this summary is undisputed, it is adopted

below:

About 7 a.m. on August 5, 1977, Dennis M. Duncan was driving his motorcycle on Interstate 5 H Street in Chula Vista. A dark-colored car occupied by two light-skinned persons approached Duncan's motorcycle. Something protruded out of the driver's window and several shots were fired. Duncan's motorcycle weaved and fell to the ground. The witness to the shooting, Mary Jane Delphenich, was unable to identify the assailants. Duncan suffered four gunshot wounds, including a fatal wound in the chest. The autopsy showed the bullets were a .22 caliber, 39 Grams and nonjacketed, and they were consistent with those operable in a 350 or 351 series Mosberg rifle. Reginald J. Fritschle was Thompson's stepfather and owned a .22 semiautomatic Mosberg rifle with a telescopic sight. He noticed the rifle was missing in March 1979. Neither Thompson nor his brother had a key to the house. About the time Fritschle noticed the rifle missing, he saw the landlady take away some of his possessions.

Nearly three years after the shooting, in July of 1980, Thompson was employed as a water softener salesperson in Los Angeles. He had a series of conversations with James A. Ward who was counselor to the salespersons of the Miracle Water Company. Ward's function was to help them increase sales. Virtually all the employees of the Miracle Water Company were members of the Church of Scientology. Ward was introduced to the salespersons as a result of his training in Scientology. Thompson told Ward he had committed a murder. Ward told Thompson he should write down a confession and turn himself in. Thompson wrote what he had told Ward and gave this written confession to Ward. The writing was introduced into evidence at trial. According to Thompson's written statement he had talked to Rose Duncan, decedent's wife, about her desire to have her husband killed in order to collect insurance monies. He told her he knew someone who could do it for $30,000-$600 in advance and the rest payable from the insurance proceeds. Thompson wrote further that he and his brother planned the shooting. After much practice with the rifle, Thompson and his brother drove past the motorcycle riding Duncan. Thompson rapidly fired 11 shots, killing Duncan. He then telephoned Rose Duncan to tell her the act had been done. Rose Duncan received $132,105.19 in insurance proceeds. She never paid Thompson any additional monies. A year before the murder (1976) Rose Duncan was convicted of the crime of soliciting someone (other than Thompson) to kill her husband.

Thompson testified and denied personal involvement in the killing. He admitted making the oral and written statements to Ward but explained he did it to test Ward's claim that nothing he could say would upset or shock him. He admitted meeting Rose and Dennis Duncan about four months before Dennis' death; he learned about Duncan's death on the radio; the detailed information contained in his statement to Ward came from facts learned from a combination of television, radio and newspaper accounts and from talking to Rose Duncan.

Thompson testified Ward told him he had reached the level of "operating thetan" [footnote omitted] in the Church of Scientology. Thompson said Ward had assured him that Ward was a minister and anything he told Ward would go no further.

1    Ward testified he was trained as an "ethics officer" but he did not hold himself out
     as an ethics officer.  He had not been ordained as an "auditor" or minister of the
2    Church of Scientology.  After Thompson orally confessed the murder to Ward,
     Ward told him it would be better to write it down.  Ward told Thompson to turn
3    himself in and if he did not do so, Ward would.  Thompson was told this before
     he wrote out the confession.  Ward does not recall telling Thompson his
4    statements were confidential.  Williams Smith, owner of Miracle Water, said
     Ward offered his services as an ethics officer in order to improve sales.  The day
5    Thompson talked to Ward, Thompson asked Smith if his statements would be
     protected from anyone outside Scientology.  Smith said yes.  Both the magistrate
6    at the preliminary hearing and the trial court held the clergyman-penitent privilege
     was inapplicable.

7

8    Respondent's Answer, Exhibit 3.

9    IV.  Discussion

10           The petition raises five claims.  In claim one, petitioner alleges that the BPT

11   improperly found that petitioner's offense was particularly egregious when weighed against other

12   murder for hire offenses.  In claim two, petitioner alleges that the BPT did not have sufficient

13   evidence to support the finding that he was a continuing danger to the public.  In claim three,

14   petitioner alleges that the BPT did not have sufficient evidence to support the finding that he

15   required additional self-help and therapy programming.  In claim five, petitioner alleges that the

16   BPT improperly found that he did not have adequate plans for his release.  Because these claims

17   all allege insufficient evidence to support the BPT's decision, they will be addressed in the same

18   section below.

19           In claim four, petitioner alleges that Cal. Penal Code § 3041 required the BPT to

20   set a parole date.  The court will address this claim separately.

21           A.  Insufficient Evidence

22           Respondent first argues that the court lacks subject matter jurisdiction to consider

23   the petition because petitioner has no liberty interest in being released on parole.  Respondent

24   confuses the subject matter jurisdiction of the court with failure to state a cognizable claim.

25   Clearly, the court has subject matter jurisdiction over petitioner's habeas corpus claim pursuant

26   to 28 U.S.C. § 2254.  Federal question jurisdiction exists if the complaint (or petition) purports to

1    state a claim under federal law regardless of the validity of the claim.  <u>Wheeldin v. Wheeler</u>, 373

2    U.S. 647, 83 S. Ct. 1441, 1444 (1963).  Only if the stated federal claim is so wholly insubstantial

3    that even a preliminary review of the merits is not required does the federal court not have

4    jurisdiction.  <u>Bell v. Hood</u>, 327 U.S. 678, 66 S. Ct. 773 (1946).  It is not every arguably failed

5    claim that deprives the district court of jurisdiction.  Here, petitioner properly invoked § 2254 for

6    the basis of his habeas claim.  His contentions that he was denied due process in the parole

7    setting process are not so insubstantial so as to deprive the court of jurisdiction.

8         Respondent next argues that California law does not give rise to a federally

9    protected liberty interest in parole release.  The Ninth Circuit rejected this argument.  <u>Sass v.</u>

10   <u>California Bd. of Prison Terms</u>, 461 F.3d 1123 (9th Cir. 2006).

11        Since the approximate five years since the issuance of <u>McQuillion v. Duncan</u>, 306

12   F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's

13   parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if

14   successful for the petitioner, will result in the establishment of an actual parole date (but never

15   less than the minimum term):

16        1. A liberty interest exists, <u>Irons v. Carey</u>, __F.3d__, 2007 WL 656345 (9th Cir.

17   2007) citing cases;

18        2.  Reliance on unchanging factors in denying parole suitability *might* implicate a

19   violation of that liberty interest.  <u>Biggs v. Terhune</u>, 334 F.3d 910, 916 (9th Cir. 2003);

20        3.  A finding by the Board of Parole Hearings (formerly BPT) (or at a later time,

21   by the Governor) concerning the circumstances or gravity of the crime in and of itself is

22   sufficient to deny suitability; <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161;

23   <u>Irons</u>, at *5; but the nature of the offense must be "particularly egregious" to constitute a basis to

24   deny parole suitability.  <u>Rosenkrantz</u>, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

25        4.  However, "particularly egregious" means nothing more than finding elements

26   in excess of those "minimally necessary to convict."  <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1095,

1   23 Cal. Rptr. 3d 417, 440 (2005);

2          5. If the petitioner has served less than the minimum term of his indeterminate

3   sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses

4   in these cases, due process was not violated when these prisoners were deemed unsuitable for

5   parole prior to the expiration of their minimum terms." Irons at *5, but see footnote 1 of Irons

6   expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is

7   the time frame against which reliance on unchanging factors is truly suspect[1];

8          6. If the BPH determined that the crime was vicious, or performed in a callous

9   manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the

10  crime – and such is adopted by the state courts on review, a federal court must find the state court

11  decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted.  Irons, supra.

12          With respect, after Irons, the undefined "mights" and "maybes" serve as an

13  indecipherable present guide to knowing just when the liberty interest in parole may be violated

14  by reliance on unchanging factors.  Moreover, one does not know whether such reliance, if it is

15  ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime

16  circumstances and passage of time.  The state courts' adoption of the BPH (BPT[2]) or Governor's

17  decision about the circumstances of the crime is now essentially unreviewable – at least prior to

18  the expiration of the minimum term.  That is, the circumstances of the crime in terms of

19  viciousness, callousness, triviality and the like, is essentially an unchanging value judgment

20

21          [1] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR §
22  2402, would expressly so limit the decision of the BPH and Governor, thus the potential
    limitation must be of federal origin.  However, as undue reliance on unchangeable factors has
23  never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the
    precise blend of crime circumstances and years since, has not been  defined.  We do know that in
24  Irons, five times of application was insufficient.  Irons did not decide that reliance on unchanging
    factors after the minimum term had been served was unlawful.  We simply know that "maybe"
25  that will be the case.

26          [2] The Board of Prison Terms recently had its name changed to the Board of Prison
    Hearings.

1    whose correctness cannot often be disputed regardless of the time when such a judgment is made

2    – right after the conviction, just prior to expiration of a minimum term, well after the expiration

3    of a minimum term. [3]

4          Review of the federal appellate cases demonstrates that no guided finding of

5    undue reliance on unchanging factors can be made in this case.  Biggs v. Terhune, supra, the case

6    that commenced the discussion on unchanging factors, involved the first degree bludgeoning

7    murder of a witness facilitated, but not committed, by Biggs.  He was denied parole eligibility at

8    his initial hearing in 1999 in part because of the gravity of the crime.  All might agree that such a

9    murder was grave, and it will never be properly classified as anything but such.  Nevertheless, the

10    Ninth Circuit found that "continued reliance" on unchanging factors could violate due process.

11    Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on

12    the circumstances of the crime would be too much.  Certainly, it was not understood by the

13    undersigned from reading Biggs that the time at which continued reliance would be too much

14    would occur in 2010 – the time at which Biggs will have served his minimum term.  Biggs'

15    minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by

16    that time.  However, subsequent Ninth Circuit cases have not upheld the undersigned's reading

17    of Biggs.

18          In Sass, no comparison review of other cases was undertaken, there was simply

19    the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity

20

---

21      [3]  The undersigned has previously determined the arbitrary nature and lack of predictive

22    value generally found in a circumstances of the crime parole suitability denial based on
   unchanging circumstances despite the passage of sixteen years and more from the date of the

23    conviction coupled with an unblemished prison record.  See Irons v. Warden of California State
   Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005).  That analysis, focusing on the

24    predictive nature of the crime for future violence in combination with expert psychiatric reports
   or other forward looking evidence, has been cited with approval by the California Court of

25    Appeal.  In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133
   Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005).  However, since that analysis only received the

26    comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt,
   that analysis concerning the trigger time of undue reliance will not be utilized herein.

of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision." Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness.  The Ninth Circuit was reviewing a third denial of suitability.  If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility.  What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why?  Will the fourth hearing be sufficient, or should it be the seventh?  Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence?  Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term?  None of these questions have been answered.

In Irons, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in Sass.  Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country.  Both positions have their points.  But one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from Irons that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence" sufficient to deny parole eligibility (suitability).

\\\\\

1    This case cannot be decided on the above finding because petitioner's

2  (Thompson's) incarceration has exceeded his minimum term.  By fortuity of the law, at the time

3  he committed his first degree murder the minimum term was set at seven years.  Even at twenty-

4  five years (the present minimum term for first degree murder), he surpassed his minimum term in

5  2005.  Petitioner was denied on his *eighth* suitability hearing.

6    Nearly the same day as Irons was decided, the Ninth Circuit reversed a grant of

7  parole eligibility in Kunkler v. Muntz, 2007 WL 683970 (9th Cir. 2007).[4]  The facts of the

8  second degree murder were not set forth in the opinion, but the fact of Kunkler's 1983

9  conviction, and the fact that Kunkler had been considered for parole suitability *ten times* were set

10  forth.  Kunkler had been imprisoned well beyond any minimum term.  On his last two BPT (now

11  BPH) hearings, the commissioners had found Kunkler suitable for parole, but the Governor

12  reversed both decisions in part on his perception of the seriousness of the crime.  Indeed, this was

13  *the* ground on which the state courts in unpublished orders had ultimately upheld the Governor's

14  decision.  The district court applied the Biggs dictum regarding reliance on unchanging factors.

15  In reversing the district court, the Ninth Circuit, citing Sass, viewed the Biggs dictum as merely

16  advice to the *next BPH panel* that it might wish to depart from its continued reliance on a non-

17  changing factor.  Kunkler at *2 ("'it is not [this court's] function to speculate about how future

18  parole hearings could proceed.'").  Evidently, no matter how many times the BPH and/or the

19  Governor utter an undoubtedly correct conclusion that a murder is serious, or a motive trivial, or

20  that the victim suffered, these unchanging factors will always constitute "some evidence" in

21  federal habeas corpus review.

22    In petitioner's case before this court, the BPT found that the offense was carried

23  out in a cruel, dispassionate and calculated manner (true, but unchanging), and that the offense

24  ───────────────

25    [4] Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in
   2007.  Ninth Circuit Rule 36-3.  Although still not precedential in the binding sense, the
   unpublished decisions do have a certain amount of persuasive value, and indicate how Ninth

26  Circuit judges apply binding precedent.

1   demonstrated a callous disregard for human suffering (true, but what will ever change about this).

2   See Answer Exhibit 2 at pg. 30.  Nevertheless, in light of the above authority, the undersigned

3   cannot find at this time that the state courts in this case were AEDPA unreasonable by failing to

4   reject the unchanging circumstances conclusion of the BPT.  Thus, as a matter of law, some

5   evidence existed to satisfy the standards of the parole suitability liberty interest.

6          Because circumstances of the crime alone can constitute some evidence, there is

7   no point in discussing the other factors of parole suitability, and whether some evidence existed

8   for the conclusions reached in the other factors by the BPT.[5]

9          If the undersigned were reviewing this matter on a clean slate, the undersigned

10  would not analyze the liberty interest involved merely by reference to a checklist of crime

11  circumstances and whether the BPH understood that a murder was serious.  Nevertheless, no

12  binding authority at present would require more than use of the checklist for the circumstances of

13  the crime factors as "some evidence" upon which to deny parole suitability.

14          B.  Penal Code Section 3041

15          Petitioner argues that Cal. Penal Code § 3041 requires the BPT to give him a

16  parole date.  Section 3041 provides that one year prior to the inmate's minimum eligible parole

17  release date a panel consisting of at least two commissioners of the BPT shall meet with the

18  inmate and *shall normally* set a parole release date.  Petitioner appears to argue that because §

19  3041 provides that the BPT shall normally set parole release dates, the BPT violated due process

20  by failing to set his parole release date.

21          As discussed above, California's parole scheme gives rise to a cognizable liberty

22  interest in release on parole.  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003).  "In the parole

23

24          [5]  Rosenkrantz also required that the then BPT also make an individualized consideration
    of the other factors regarding parole suitability.  Of course, the Commissioners always make such
25  a determination as the Commissioners know that they must.  Whether these determinations are
    supported by some evidence is another matter, but as long as the consideration is made, the
26  circumstances of the crime are sufficient to deny suitability.

1   context, the requirements of due process are met if 'some evidence' supports the decision." <u>Id.</u>

2   If there is not some evidence to support a decision denying parole, due process is violated.

3   Therefore, even though California law states that the BPT shall normally set parole release dates,

4   due process does not require the BPT to state a date where some evidence exists demonstrating

5   that petitioner should not be paroled.  Accordingly, petitioner's claim that the BPT was required

6   to set his parole release date pursuant to Cal. Penal Code § 3041 is without merit.

7        Because the denial of this claim by the Superior Court was not an unreasonable

8   application of clearly established Supreme Court authority, this claim should be denied.

9        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

10  a writ of habeas corpus be denied.

11       These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within ten days after service of the objections.  The parties are advised

17  that failure to file objections within the specified time may waive the right to appeal the District

18  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: 3/27/07

20                                              /s/ Gregory G. Hollows

21                                              _____
                                                GREGORY G. HOLLOWS

22                                              UNITED STATES MAGISTRATE JUDGE

23  ggh:kj
    thomp1158.157

24

25

26